494 A.2d 181

Milton M. VANE

v.

Sam NOCELLA et al.

No. 34, Sept. Term, 1984.

Court of Appeals of Maryland.

June 27, 1985.

**364**

Allan B. Rabineau, Baltimore, for appellant.

Bernard W. Rubenstein, Baltimore (H. Victoria Hedian and Edelman & Rubenstein, P.A. and Herbert J. Belgrad, Harriet E. Cooperman and Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A., Baltimore, on brief) for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired) Specially Assigned.

COLE, Judge.

We granted certiorari in this case to decide whether the trial court erred in finding that the National Labor Relations Act (NLRA or Act), 29 U.S.C.

§§ 151–169 (1982), preempted appellant's state common law action for tortious interference with contractual relations.

We glean the following facts from the record. Appellant, Milton M. Vane, was employed by H.L. Hartz & Sons (Hartz) as an industrial engineer. In his deposition, appellant explained that his position entailed the regulation of production employees through the establishment of piece rates. Piece rates are incentive rates that compensate employees according to their productivity. In addition to establishing these rates, appellant instituted and applied the rates in the shops, and met with business agents of the Amalgamated Clothing and Textile Workers of America (Union) to negotiate settlements.

Sam Nocella, Manager of the Union's Baltimore Regional Joint Board, participated in the negotiation of piece rates at Hartz. Nocella and the Union objected to these rates because they considered them unjust. Discussion between Nocella, as Union representative, and appellant's immediate supervisor allegedly led to a demand by Nocella and the Union that Hartz dismiss appellant or else run the risk of having the Union considerably increase its wage demands. In response, Hartz dismissed appellant on June 16, 1981.

Appellant filed a two count declaration in the Superior Court of Baltimore City (now Circuit Court for Baltimore City) against Nocella and the Union, alleging that they "intentionally and willfully coerced the employer into terminating" appellant's employment. In his declaration appellant sought both compensatory and punitive damages. In accordance with former Md. Rule 323 a 10 (now Md. Rule 2–322(b)(1)), appellees filed a Motion Raising Preliminary Objection on the basis that the trial court lacked jurisdiction over the subject matter of the suit. The trial court granted this motion on October 11, 1983, ruling that the National Labor Relations Board (NLRB or Board) had exclusive jurisdiction over the action. Appellant filed an order of appeal with the Court of Special Appeals, but we granted certiorari prior to decision by that Court. We affirm.

I

Federal labor law preemption is a complex and evolving body of law which this Court has had few occasions to analyze. *See, e.g., Memco v. Maryland Employment Security Administration,* 280 Md. 536, 375 A.2d 1086 (1977) [hereinafter cited as *Memco*]; *Baltimore Building & Construction Trades Council v. Maryland Port Authority,* 238 Md. 232, 208 A.2d 564 (1965). In light of the significant increase in Supreme Court decisional law in this area since *Memco* and in view of the Supreme Court's refinement and modification of the basic federal labor preemption doctrine since its formulation over a quarter of a century ago in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) [hereinafter cited as *Garmon*], we find it useful to provide a brief overview of this doctrine.

## A.

The enactment of the NLRA in 1935 marked a fundamental change in this Nation's labor policies. Congress expressly recognized that collective organization of segments of the labor force into bargaining units capable of exercising economic power comparable to that possessed by employers could produce benefits for the entire economy. Congress determined that those benefits would eventually outweigh the occasional costs of industrial strife associated with the organization of unions and the negotiation and enforcement of collective bargaining agreements. The previous notion that union activity was a "conspiracy" and that strikes and picketing were examples of unreasonable restraints of trade was replaced by an unequivocal national declaration of policy establishing the legitimacy of labor unionization and encouraging collective bargaining. *See Sears, Roebuck & Co. v. San Diego County District Council of Carpenters,* 436 U.S. 180, 190, 98 S.Ct. 1745, 1754, 56 L.Ed.2d 209, 221 (1978) [hereinafter cited as *Sears*]; R. Gorman, *Basic Text on Labor Law* 1–6 (1976).

Through the NLRA Congress sought to protect the collective bargaining activities of employees and their representatives. To that end, Congress created a regulatory scheme to be administered by a federal agency (NLRB) that would, in Congress's view, develop experience and expertise in the labor relations area. As Justice Stevens explained in *Sears,* "[t]he interest in uniform development of the new national labor policy required that matters which fell squarely within the regulatory jurisdiction of the [NLRB] be evaluated in the first instance by that agency." *Sears, supra,* 436 U.S. at 191, 98 S.Ct. at 1754, 56 L.Ed.2d at 222. Thus, to achieve uniform as well as effective enforcement of the national labor policy, Congress vested the NLRB, not federal or state courts, with primary jurisdiction over activities subject to regulation by the Board. *Local 926, International Union of Operating Engineers v. Jones,* 460 U.S. 669, 681, 103 S.Ct. 1453, 1461, 75 L.Ed.2d 368, 379 (1983) [hereinafter cited as *Jones*]. In this respect, the "animating force" behind the federal labor law preemption doctrine "has been the recognition that nothing could more fully serve to defeat the purposes of the Act than to permit state and federal courts, without any limitation, to exercise jurisdiction over activities that are subject to regulation by the [NLRB]." *Sears, supra,* 436 U.S. at 218, 98 S.Ct. at 1768, 56 L.Ed.2d at 238 (Brennan, J., dissenting).

This congressional scheme thus comports with the constitutional principles of preemption, which are designed to avoid conflicting regulation of conduct by various official bodies that might have some authority over the subject matter. *Amalgamated Association of Motor Coach Employees v. Lockridge,* 403 U.S. 274, 285–86, 91 S.Ct. 1909, 1917, 29 L.Ed.2d 473, 482 (1971) [hereinafter cited as *Lockridge*]. Justice Jackson, writing for a unanimous Court in a 1953 decision involving the Labor Management Relations Act, succinctly articulated the rationale underlying the federal labor law preemption doctrine:

Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply

law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.... A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law.

*Garner v. Teamsters Union,* 346 U.S. 485, 490–91, 74 S.Ct. 161, 165–66, 98 L.Ed. 228, 239–40 (1953).

The doctrine of preemption in labor law has also been shaped by a competing consideration. *See Memco, supra,* 280 Md. at 551, 375 A.2d at 1095. In enacting the NLRA, Congress never determined the precise extent to which state law must be displaced to achieve the unifying ends sought by the national legislature. "This has, quite frankly, left the Court with few available options." *Lockridge, supra,* 403 U.S. at 289, 91 S.Ct. at 1919, 29 L.Ed.2d at 484. Consequently, a major difficulty with labor law preemption analysis is that "the aims and social policy" Congress was implementing "were drawn with broad strokes while the details had to be filled in, to no small extent, by the judicial process." *Garmon, supra,* 359 U.S. at 240, 79 S.Ct. at 777, 3 L.Ed.2d at 780; *see also New York Telephone Co. v. New York State Department of Labor,* 440 U.S. 519, 527, 99 S.Ct. 1328, 1334, 59 L.Ed.2d 553, 561 (1979) (plurality opinion) (courts relegated task of determining "the extent to which Congress has placed implicit limits on the 'permissible scope of state regulation of activity touching upon labor-management relations.'") (quoting *Sears, supra,* 436

U.S. at 187, 98 S.Ct. at 1752, 56 L.Ed.2d at 219). As the Supreme Court put in *Lockridge*:

The principle of pre-emption that informs our general national labor law was born of this Court's efforts, without the aid of explicit congressional guidance, to delimit state and federal judicial authority over labor disputes in order to preclude, so far as reasonably possible, conflict between the exertion of judicial and administrative power in the attainment of the multifaceted policies underlying the federal scheme.

*Lockridge, supra,* 403 U.S. at 286, 91 S.Ct. at 1918, 29 L.Ed.2d at 482–83.

### B.

Judicial experience with numerous approaches to the federal preemption issue eventually led the Supreme Court to articulate two distinct doctrines for determining whether state regulations or causes of action are preempted by the NLRA. *See Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. ——, ——, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728, 746 (1985) [hereinafter cited as *Metropolitan Life*]; *Belknap, Inc. v. Hale,* 463 U.S. 491, 498, 103 S.Ct. 3172, 3176–77, 77 L.Ed.2d 798, 806–07 (1983); *see also Memco, supra,* 280 Md. at 551–55, 375 A.2d at 1095–97. The particular preemption doctrine that is the focus of this litigation is the so-called *Garmon* rule, which had its genesis in *Garmon, supra.*[1]

---

1. The other preemption doctrine, referred to as the Machinists preemption doctrine, *see Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), protects against state interference with policies implicated by the structure of the NLRA itself, by preempting state law and state causes of action concerning conduct that Congress intended to be unregulated. *See Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. ——, ——, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728, 746 (1985); *New York Tel. Co. v. New York State Dep't of Labor,* 440 U.S. 519, 531, 99 S.Ct. 1328, 1336, 59 L.Ed.2d 553, 563 (1979) (plurality opinion). This doctrine was designed, at least initially, to govern preemption questions that arose concerning activity that was neither arguably protected against employer interference by §§ 7 and 8(a)(1) of the NLRA, nor arguably

■ At its most basic level, the *Garmon* rule provides that state and federal courts must yield exclusive jurisdiction to the NLRB whenever the conduct the state seeks to regulate is in an area subject to NLRB jurisdiction and is also either protected or arguably protected by § 7 of the Act, or is prohibited or arguably prohibited by § 8 of the Act. *See* Cox, *Recent Developments in Federal Labor Law Preemption,* 41 Ohio St. L.J. 277, 277 (1980). Justice Frankfurter, writing for the *Garmon* Court, "made two statements which have come to be accepted as the general guidelines for deciphering the unexpressed intent of Congress regarding the permissible scope of state regulation of activity touching upon labor-management relations." *Sears, supra,* 436 U.S. at 187, 98 S.Ct. at 1752, 56 L.Ed.2d at 219. The first statement, set forth below, relates to activity that is clearly protected or prohibited by the Act:

When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power

---

prohibited as an unfair labor practice by § 8(b) of the Act. More recently, the Machinists preemption doctrine has been used to determine the validity of state rules of general application that affect the right to bargain or to self organization. *See New York Tel. Co. v. New York State Dep't of Labor, supra.* This doctrine involves an analysis of the structure of the federal labor law to determine whether certain conduct was meant to be unregulated, not a balancing of federal and state interests in the first instance. An appreciation of the state's interest in regulating a certain kind of conduct, however, may still be relevant in determining whether Congress in fact intended the conduct to be unregulated. *See Metropolitan Life Ins. Co. v. Massachusetts, supra,* 471 U.S. at —— & n. 27, 105 S.Ct. at 2394 & n. 27, 85 L.Ed.2d at 746 & n. 27. All parties correctly understand this case not to involve Machinists preemption. *Cf. Memco v. Maryland Employment Sec. Admin.,* 280 Md. 536, 375 A.2d 1086 (1977) (Machinists preemption case).

asserted by Congress and requirements imposed by state law.

*Garmon, supra,* 359 U.S. at 244, 79 S.Ct. at 779, 3 L.Ed.2d at 782. The second statement went on to articulate a more sweeping prophylactic rule:

> When an activity is *arguably* subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

*Id.* at 245, 79 S.Ct. at 780, 3 L.Ed.2d at 783 (emphasis supplied). This rule displaces state jurisdiction when the activity is actually or arguably "within the compass of § 7 or § 8 of the Act," *id.* at 246, 79 S.Ct. at 780, 3 L.Ed.2d at 784, and "protects the primary jurisdiction of the NLRB to determine in the first instance what kind of conduct is either prohibited or protected by the NLRA." *Metropolitan Life, supra,* 471 U.S. at ——, 105 S.Ct. at 2394, 85 L.Ed.2d at 746 (footnote omitted).

The Supreme Court has repeatedly stated that pre-emption under the *Garmon* rule involves a balancing process. *See, e.g., id.* at —— n. 26, 105 S.Ct. at 2394 n. 26, 85 L.Ed.2d at 746 n. 26; *Belknap, Inc. v. Hale, supra,* 463 U.S. at 498–99, 103 S.Ct. at 3177, 77 L.Ed.2d at 807. Specifically, a court must balance the state's interest in controlling or remedying the effects of the conduct in question against the interference with the NLRB's ability to adjudicate controversies committed to it by the NLRA, and the risk that the state will sanction the conduct that the Act protects. *Metropolitan Life, supra,* 471 U.S. at ——, 105 S.Ct. at 2394 n. 26, 85 L.Ed.2d at 746 n. 26. This balancing process is in concert with the Court's admonition that the *Garmon* guidelines are not to be applied "in a literal, mechanical fashion." *Sears, supra,* 436 U.S. at 188, 98 S.Ct. at 1753, 56 L.Ed.2d at 220 (footnote omitted).

The same doctrinal considerations that form the basis of the *Garmon* rule have led the Supreme Court to recognize exceptions in appropriate classes of cases. Under

these judicially developed exceptions [2] a state regulation or cause of action may be sustained if the behavior to be regulated is behavior that is of only peripheral concern to the federal law ("peripheral concern" exception) or touches interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, the Court could not infer that Congress had deprived the states of the power to act ("deeply rooted in local feeling" exception). *See, e.g., id.* at 188–89 n. 13, 98 S.Ct. at 1753 n. 13, 56 L.Ed.2d at 220 n. 13; *Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 296–97, 97 S.Ct. 1056, 1061, 51 L.Ed.2d 338, 348 (1977) [hereinafter cited as *Farmer*]. In accordance with these considerations, the Supreme Court has held that the NLRA does not preempt state actions for intentional infliction of emotional distress, *see Farmer, supra,* libel, *Linn v. United Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), the enforcement of laws concerning violence, *Youngdahl v. Rainfair, Inc.,* 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957), and obstruction of access, *Automobile Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958).

## C.

In 1978, the Supreme Court in *Sears* further refined the *Garmon* rule by identifying different criteria to be con-

---

**2.** In addition to the judicially developed exceptions to the Garmon rule, Congress has created exceptions to the NLRB's exclusive jurisdiction in other classes of cases. *See, e.g.,* 29 U.S.C. § 187 (1982) (authorizes anyone injured in his business or property by activity violative of § 8(b)(4) of the NLRA to recover damages in federal district court even though the underlying unfair labor practices are remediable by the Board); 29 U.S.C. § 185 (1982) (authorizes suits for breach of a collective bargaining agreement even if the breach is an unfair labor practice within the Board's jurisdiction); *id.* § 164(c)(2) (permits state agencies and state courts to assert jurisdiction over labor disputes over which the NLRB declines, pursuant to § 164(c)(1), to assert jurisdiction). *See generally Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 189–90 n. 14, 98 S.Ct. 1745, 1753 n. 14, 56 L.Ed.2d 209, 220–21 n. 14 (1978) (listing legislatively created exceptions to NLRB's exclusive jurisdiction); 18A T. Kheel, *Business Organizations* § 9.07[1], at 9–155 (1979) (same).

sidered in determining whether a state court's jurisdiction is preempted by the NLRA. These criteria depend upon whether the activity at issue is arguably prohibited under § 8 of the NLRA or arguably protected under § 7 of that Act. Under the arguably prohibited prong of the *Garmon* rule, a court must first determine whether a significant state interest exists in protecting the citizen from the challenged conduct. Once the court makes this determination, it must then decide whether the exercise of state jurisdiction entails "little risk of interference with the regulatory jurisdiction of the Labor Board." *Sears, supra,* 436 U.S. at 196, 98 S.Ct. at 1757, 56 L.Ed.2d at 225. According to the *Sears* Court:

> The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to (as in *Garner*) or different from (as in *Farmer*) that which could have been, but was not, presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid.

*Id.* at 197, 98 S.Ct. at 1757–58, 56 L.Ed.2d at 225–26 (footnote omitted).

Under the arguably protected prong of *Garmon,* the *Sears* Court adopted a different analytical framework because "[c]onsiderations of federal supremacy ... are implicated to a greater extent when labor-related activity is protected than when it is prohibited." *Id.* at 200, 98 S.Ct. at 1759, 56 L.Ed.2d at 227. This aspect of the *Garmon* rule is principally concerned with the danger of state interference with federally protected conduct. After noting "the relative unimportance in this context of the 'primary jurisdiction' rationale articulated in *Garmon*[,]" the Court explained that "[t]he primary-jurisdiction rationale justifies preemption only in situations in which an aggrieved party

has a reasonable opportunity either to invoke the Board's jurisdiction himself or else to induce his adversary to do so." *Id.* at 200–01, 98 S.Ct. at 1759, 56 L.Ed.2d at 227–28. To shed light onto the application of these analytical models, it is useful to review the factual circumstances in *Sears.*

Upon determining that carpentry work in Sears's store was being done by carpenters who had not been dispatched from the union's hiring halls, the union established picket lines on Sears's property. Sears sought a preliminary injunction in state court against the continuing trespass when the union refused to remove the pickets from Sears's property. The trial court entered a preliminary injunction prohibiting the union from picketing on Sears's property. The Court of Appeal of California affirmed, but the State Supreme Court reversed, holding that because the picketing was both arguably protected by § 7 of the NLRA and arguably prohibited by § 8 of that Act, state jurisdiction was preempted under the *Garmon* guidelines.

The United States Supreme Court reversed. Although the union's activities were arguably prohibited under § 8 of the NLRA as having a recognitional or work reassignment objective, the *Sears* Court found that the controversy that Sears might have presented to the NLRB was not the same as the controversy presented to the state court. Had Sears filed an unfair labor practice charge with the NLRB, the issue before that agency would have been whether the picketing had a recognitional or work reassignment objective. By contrast, in the state court Sears only challenged the location of the picketing. Because the issues were sufficiently different, the *Sears* Court held that permitting the state court to adjudicate Sears's trespass claim could create no realistic risk of interference with the NLRB's primary jurisdiction to enforce the statutory prohibition against unfair labor practices. *Id.* at 198, 98 S.Ct. at 1758, 56 L.Ed.2d at 226.

With respect to the arguably protected prong of *Garmon,* the Supreme Court indicated that the union's activities were

arguably protected under § 7 of the NLRA as having the objective of securing Sears's compliance with area standards. The *Sears* Court, however, found that the arguably protected character of the union's picketing did not provide a sufficient justification for preemption of the state court's jurisdiction over Sears's trespass claim when, as in *Sears,* the party who could have presented the protection issue to the NLRB had not done so and the other party to the dispute had no acceptable means of doing so. The Court went on to explain that permitting state courts to evaluate the merits of an argument that certain trespassing activity is protected does not create an unacceptable risk of interference with conduct that the NLRB, and a court reviewing the NLRB's jurisdiction, would find protected. *Id.* at 205, 98 S.Ct. at 1761, 56 L.Ed.2d at 230.

## II

In light of the *Garmon* rule and its multifaceted aspects, appellant advances two basic arguments in support of his contention that the trial court erred in granting the appellees' Motion Raising Preliminary Objection. First, appellant contends that he is not subject to NLRB jurisdiction because, as a managerial or supervisory employee, he is not covered by the Act. Second, in an alternative argument, appellant argues that the conduct the state is asked to regulate is neither protected nor prohibited by the NLRA so as to confer jurisdiction upon the NLRB. Our examination of the federal labor law preemption doctrine leads us to conclude that the trial court did not err in granting the appellees' Motion Raising Preliminary Objection.

## A.

We do not, of course, write on a clean slate in analyzing the issue presented in this case. The Supreme Court has considered on several occasions whether a common law tort action for interference with a contract of employment is preempted by the NLRA. *See Jones, supra; Iron Workers*

*Union v. Perko*, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963) [hereinafter cited as *Perko*]. In these cases the Court found that the NLRA preempted the state causes of action. Because we consider *Jones* and *Perko* dispositive of the issue presented in the case *sub judice*, we examine those cases in greater detail.

Perko, a member of the Iron Workers Union (Union), worked sometimes as a regular ironworker, sometimes as a foreman, and sometimes as a superintendent. While working as a superintendent on a particular project, the Union suspended his membership because he had violated a union rule. Union representatives then informed Perko's employer that because of Perko's violation Union members would no longer take orders from him. Several weeks later the employer discharged Perko because of his dispute with the Union.

Perko filed a complaint in state court against the Union and certain of its officers alleging that the defendants had tortiously interfered with his employment relations. Perko eventually secured a jury verdict of $25,000, and the Court of Appeals of Ohio affirmed. The United States Supreme Court reversed, holding that the case fell squarely within the preemption principles declared in *Garmon*. *Id.* at 705–06, 83 S.Ct. at 1431–32, 10 L.Ed.2d at 649. In so holding, the *Perko* Court assigned "two independent and conclusive" reasons. First, because Perko had been employed at various times as a regular ironworker, foreman, and superintendent, difficult problems of definition of status arose. These problems "are precisely 'of a kind most wisely entrusted initially to the agency charged with the day-to-day administration of the Act as a whole.'" *Id.* at 706, 83 S.Ct. at 1432, 10 L.Ed.2d at 650 (quoting *Marine Engineers Beneficial Association v. Interlake Steamship Co.*, 370 U.S. 173, 180, 82 S.Ct. 1237, 1241, 8 L.Ed.2d 418, 424 (1962)). Given Perko's fluctuating status, his position as a foreman was arguably nonsupervisory and hence covered by the

NLRA.[3] Consequently, Perko's discharge arguably violated the unfair labor practices prohibited by §§ 8(b)(1)(A) and 8(b)(2) of the Act.[4]

Second, the *Perko* Court indicated that even if Perko were solely a supervisor "there is a sufficient probability that the matter would still have been cognizable by the Board so as to compel the relinquishment of state jurisdiction." *Perko, supra,* 373 U.S. at 707, 83 S.Ct. at 1432, 10 L.Ed.2d at 650. Specifically, the Union arguably violated § 8(b)(1)(A) of the Act, because causing the discharge of a supervisor might coerce employees, who would fear being discharged, into foregoing their § 7 rights to engage in concerted action. In addition, and more important for our purposes, the Union's conduct in *Perko* might have violated § 8(b)(1)(B), which prohibits unions from restraining or coercing "an employer in the selection of his representatives for the purposes of collective bargaining or the adjust-

---

**3.** Supervisors are expressly excluded from the definition of employee in § 2(3) of the Act. A supervisor is defined in § 2(11) as:

(11) The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

**4.** These particular sections of the Act define certain employer and union practices as unfair labor practices. Section 8(b) provides in pertinent part:

It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 ... or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section[.]

Section 8(a)(3), in turn, makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]"

ment of grievances[.]" According to the *Perko* Court, whether Perko had sufficient grievance-handling responsibilities was in any event a question for initial determination by the Board.

Twenty years after its decision in *Perko*, the Supreme Court addressed the issue of whether a state court action brought by one who is a supervisor within § 2(11) of the NLRA for interference by a union with his contractual relationships with his employer is preempted by the Act. *See Jones, supra.* Factually, Jones accepted a supervisory position with the Georgia Power Company (Company) and reported to work on June 12, 1978. Jones, however, was discharged less than two weeks later. Jones thought that the bargaining agent for Local 926 of the International Union of Operating Engineers (Union) had persuaded the Company to discharge him because years earlier Jones had worked for a nonunion employer. Jones subsequently filed a charge with the Board's Regional Director against the Union on the basis of the latter's violation of §§ 8(b)(1)(A) and 8(b)(1)(B) of the NLRA. In particular, Jones alleged that the Union had "procured" his discharge, "and thereby coerced [the Company] in the selection of its supervisors and bargaining representative, because [Jones] had not been a member in good standing of said labor organization." The Regional Director would not issue a complaint, and Jones did not appeal to the General Counsel in accordance with then 29 C.F.R. § 102.19 (1982). Instead, Jones sued both the Union and the Company in state court, alleging that the Union had interfered with the contract between him and the Company. Specifically, Jones alleged that the business agent and representative of the Union had "maliciously and with full intent, intimidated and coerced Georgia Power Company, or caused Georgia Power Company to be intimidated and coerced, into breaching its employment contract with [Jones]." The remaining count in Jones's complaint sought relief against the Company and alleged that the Company had breached its employment contract.

The trial court dismissed the complaint on the basis that the NLRA preempted the common law tort action insofar as the subject matter of the complaint was arguably within the NLRB's exclusive jurisdiction. The Court of Appeals of Georgia reversed the dismissal of the case against the Union, holding that the cause of action was not preempted by the NLRA because it fell within the exceptions to the *Garmon* rule. The Supreme Court of Georgia denied review, and the Supreme Court granted Jones's petition for writ of certiorari.

In holding that Jones's state court action was preempted by the NLRA, the Court, referring to *Perko,* observed that "[n]ot only is this case a variant of a familiar theme, but we have heard this same tune before." *Jones, supra,* 460 U.S. at 677, 103 S.Ct. at 1459, 75 L.Ed.2d at 376. As in *Perko,* it was clear that the Union's conduct in *Jones* was arguably prohibited by § 8(b)(1)(B), which forbids a union to coerce an employer in the choice of his bargaining representatives. In addition, although there was some doubt whether Perko was a supervisor within the meaning of the NLRA, there was no such doubt in *Jones.* The *Jones* Court, however, carefully indicated that not every supervisor is a representative for the purposes of collective bargaining or the adjustment of grievances for purposes of § 8(b)(1)(B). Justice White, writing for the *Jones* Court, nevertheless found that Jones arguably had collective bargaining responsibilities:

But in this case, Jones was to occupy the position of equipment supervisor; it is enough if in this position he would be authorized or expected to deal with grievances arising under the collective-bargaining agreement, *American Broadcasting Cos. v. Writers Guild,* 437 U.S. 411, 427, n. 25 [, 98 S.Ct. 2423, 2432 n. 25, 57 L.Ed.2d 313, 326 n. 25] (1978); and Jones' complaint filed with the Regional Director indicated that he would have collective-bargaining responsibilities. It is at least arguable that this was the case, and it was for the Board, not the state courts, to decide whether Jones was the kind of supervisor who could invoke § 8(b)(1)(B). We thus agree with the Union

and the Board that the Union, if it was responsible for Jones' discharge, arguably coerced the Company in the choice of its collective-bargaining representative.

*Jones, supra,* 460 U.S. at 679–80, 103 S.Ct. at 1460–61, 75 L.Ed.2d at 378 (footnote omitted).

The Court rejected Jones's reliance on *Sears* for the proposition that there should be no preemption because his state cause of action and the unfair labor practice charge were not sufficiently alike. Jones argued that for his state cause of action he need only show that the Union caused, either coercively or noncoercively, the employer's selection of a supervisor. By contrast, he asserted that a § 8(b)(1)(B) unfair labor practice claim is established only by proving coercion of an employer in the selection of its bargaining representative. On the basis of this reasoning, Jones concluded that the unfair labor practice charge was distinct from the state cause of action because federal law does not forbid noncoerced discharges.

The *Jones* Court rejected this argument for several reasons. First, Jones's argument necessarily conceded that his state cause of action was preempted to the extent that it covers coercive influence on the employer. Indeed, Jones's state court complaint averred that the Union had "intimidated and coerced" the Company into breaching its contract with Jones. *Id.* at 682, 103 S.Ct. at 1462, 75 L.Ed.2d at 379.

Second, the NLRB, not the state courts, should resolve in the first instance whether the Union's conduct was coercive. If coercive, the NLRB has the power to impose a sanction because of such conduct. If, however, the NLRB determines that the Union's conduct was noncoercive, the action is the proper subject of state suit.

Third, assuming Georgia law reaches noncoercive interference with contractual relationships, it remains that in both the unfair labor practice charge and the state cause of action the discharge must be shown to be the result of Union influence. As a result "the federal and state claims are thus the same in a fundamental respect[.]" *Id.* at 682,

103 S.Ct. at 1462, 75 L.Ed.2d at 380. Finally, the Court stated that the "peripheral concern" and "deeply rooted in local law" exceptions to the federal labor law preemption doctrine did not apply in *Jones.*

## B.

Our reading of *Perko* and *Jones* leads us to conclude that the NLRA preempts appellant's state cause of action. As in those two cases, it is clear in this case that the Union's conduct was arguably prohibited by § 8(b)(1)(B), which forbids a labor organization or its agents to restrain or coerce an employer in the choice of its representative for the purposes of collective bargaining or the adjustment of grievances. Although we recognize that whether appellant had sufficient collective bargaining or grievance-handling responsibilities to bring § 8(b)(1)(B) into play is a question for initial determination by the Board, *see Perko, supra,* 373 U.S. at 708, 83 S.Ct. at 1433, 10 L.Ed.2d at 651, it is apparent that appellant may well have had sufficient responsibilities in these areas "to come within the realm of supervisors whose selection the Union could not seek to dictate." *Jones, supra,* 460 U.S. at 677, 103 S.Ct. at 1459, 75 L.Ed.2d at 377. Appellant indicated in his deposition that he was involved in negotiations with Union representatives, and Nocella stated in his affidavit that appellant in fact had collective bargaining and grievance-handling responsibilities. According to *Jones,* the criterion is not whether the plaintiff actually had these responsibilities; rather, "it is enough if in this position he would be *authorized or expected* to deal with grievances arising under the collective-bargaining agreement[.]" *Id.* at 679, 103 S.Ct. at 1460, 75 L.Ed.2d at 378 (emphasis supplied). It is therefore at least arguable that the appellant would have collective bargaining responsibilities. As a result, it is for the NLRB, not for Maryland courts, to decide in the first instance whether appellant was the kind of supervisor or managerial employee who could invoke § 8(b)(1)(B). Similar to the Supreme Court's conclusions in *Perko* and *Jones,* we too

agree with the Union that if it was responsible for appellant's discharge, it arguably coerced Hartz in the choice of the latter's collective bargaining representative.

Appellant seeks to distinguish *Jones* on several bases, none of which is persuasive in our view. First, appellant makes much of the fact that Jones initially filed his complaint with the NLRB, while appellant did not file a complaint with the Board but instead filed a declaration in state court. The short answer to this argument is that the Supreme Court did not view this procedural distinction as significant or controlling in *Jones*. Moreover, appellant ignores the procedural history in *Perko*, a case upon which the *Jones* Court placed heavy reliance. In *Perko*, as here, the plaintiff brought his cause of action in state court in the first instance. We therefore reject appellant's attempt to distinguish *Jones* on this basis.

Second, appellant asks us to distinguish *Jones* on the ground that Jones had been a union member, while appellant had never been a member of a union. The *Jones* Court placed no significance on this factual distinction, and neither do we.

■ Despite our refusal to distinguish *Jones* on the bases suggested above, appellant nonetheless argues that because managerial employees are exempt from the Act's coverage under *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), he had no standing to file a complaint with the Board. This argument necessarily presupposes that appellant is a managerial employee, a fact that is not clearly borne out by the record. Neither does the record clearly indicate whether appellant is a supervisor. In any event, we find relevant the observation in *Jones* that "the notion that supervisors do not have a cause of action in any circumstance ... is contrary to Board cases and to *Perko*." *Jones, supra*, 460 U.S. at 680, 103 S.Ct. at 1461, 75 L.Ed.2d at 378. Thus, on our view of the case, appellant is incorrect in asserting that he is precluded from filing a complaint with the Board. Indeed, federal labor

law regulations provide that "[a] charge that any person has engaged in or is engaging in any unfair labor practice affecting commerce may be made by *any person.*" *See* 29 C.F.R. § 102.9 (1984) (emphasis supplied).[5]

## C.

■ The controversy in this case arguably involves the "arguably prohibited" prong of the *Garmon* rule. Under this prong the critical inquiry is whether the controversy presented to the state court is identical to or different from that which could have been, but was not, presented to the NLRB. *See Sears, supra,* 436 U.S. at 197, 98 S.Ct. at 1757, 56 L.Ed.2d at 225. Under both the state cause of action and the unfair labor practice under § 8(b)(1)(B) of the Act, an element that must be proved is that the discharge be shown to be the result of union influence. *See Jones, supra,* 460 U.S. at 682, 103 S.Ct. at 1462, 75 L.Ed.2d at 380. It is not without interest that appellant's declaration in the state court alleged that the Union had "coerced" Hartz into terminating appellant's employment. The *Jones* Court made clear that a coerced discharge and breach of contract are preempted by the NLRA. *Id.* Thus, the federal and state claims are the same in a fundamental respect.[6]

---

**5.** 29 C.F.R. § 102.1 (1984) incorporates the definition of "person" in § 2(1) of the NLRA. That latter section states: "The term 'person' includes one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in cases under title 11, or receivers." *See* 29 U.S.C. § 152(1) (1982).

**6.** Maryland law has long recognized the tort of wrongful interference with contractual relations. *See Rite Aid Corp. v. Lake Shore Investors,* 298 Md. 611, 617, 471 A.2d 735, 738 (1984). This tort provides that a third party who, without legal justification, intentionally interferes with the rights of a party to a contract, or induces a breach thereof, is liable in tort to the injured contracting party. *See Wilmington Trust Co. v. Clark,* 289 Md. 313, 329, 424 A.2d 744, 754 (1981). In the context of this tort, our cases have made abundantly clear that a defendant is under a legal duty to refrain from the use of coercion. *See e.g., Sumwalt Co. v. Knickerbocker Ice Co.,* 114 Md. 403, 413, 80 A. 48, 50 (1911) (plaintiff had right to carry on its business under the contract, "and it was the legal duty of the defendant to refrain from

Appellant does not specifically argue that his cause of action is of only peripheral concern to the federal labor policy, nor does he expressly contend that such action is so deeply rooted in local law that this state's interest in enforcing the law overrides the interference with the federal labor law that prosecution of the state action would entail. In light of *Jones* and *Perko,* the appellant would indeed encounter difficulty in suggesting that these exceptions apply. Consequently, appellant does not come within the ambit of these exceptions to the *Garmon* rule.

Finally, appellant raises a host of arguments that are, in our view, unconvincing. First, appellant refers us to *Sears* for the proposition that "[t]he primary-jurisdiction rationale justifies pre-emption only in situations in which an aggrieved party has a reasonable opportunity either to invoke the Board's jurisdiction himself or else to induce his adversary to do so." *Sears, supra,* 436 U.S. at 201, 98 S.Ct. at 1759, 56 L.Ed.2d at 228. In light of this proposition, appellant argues that "as a member of management, [he] had no right to invoke the Board's jurisdiction." The flaw with this argument is that the above-quoted passage is simply irrelevant to the instant case. The *Sears* Court made this statement in the context of discussing the "arguably protected" prong of the *Garmon* rule, not the "arguably prohibited" prong of the rule that is the focus of inquiry in this case.

Second, for reasons that elude us, appellant contends that the Union's conduct is not of concern to the federal labor law regulatory scheme. Our response to this contention is that Congress considered such conduct to rise to the level of an unfair labor practice under § 8(b)(1)(B) of the Act.

---

the use of intimidation, force, coercion, threats, or any other illegal means with a view of preventing it from doing so[.]"); *Willner v. Silverman,* 109 Md. 341, 356, 71 A. 962, 964 (1909) ("While the law does not furnish a shield against the effects of fair and honest competition, yet injury to the business of another, if accomplished by threats or coercion, constitutes a ground of action for damages on the part of the person so injured.").

Third, *Garmon* squarely rejected appellant's argument that he should be permitted to go forward in the state court because the remedies sought (punitive damages) could not be awarded if his complaint had gone before the Board. *See Garmon, supra,* 359 U.S. at 246–47, 79 S.Ct. at 780–81, 3 L.Ed.2d at 783–84.

## III

We conclude that a Maryland court's jurisdiction over appellant's cause of action involves an intolerable risk of interference with the unfair labor practice jurisdiction of the NLRB. Consequently, we hold that the trial court did not err in holding that the NLRA preempts appellant's state cause of action.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.

APPELLANT TO PAY THE COSTS.