502 A.2d 1101

**Robert PEMBERTON**

v.

**BETHLEHEM STEEL CORPORATION et al.**

**No. 518, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

Jan. 14, 1986.

Certiorari Denied May 21, 1986.

136

138

Harry Goldman, Jr. (Robert G. Skeen and Goldman & Skeen, P.A. on brief), Baltimore, for appellant.

Douglas D. Connah, Jr. (Elizabeth C. Honey Well, Clayton H. Paterson, Venable, Baetjer and Howard; Charles G. Bernstein, C. MacNair Speek; Lord, Whip, Coughlan & Green, P.A.; David M. Buffington, Stephen M. Silvestri, Janet M. Truhe, Semmes, Bowen & Semmes; and Nancy E. Gregor, Kramon & Graham, all on brief), Baltimore, for appellee.

Argued before WILNER, WEANT and GARRITY, JJ.

WILNER, Judge.

Through a declaration and an amended declaration filed in the Circuit Court for Baltimore City, appellant charged Bethlehem Steel Corporation and 26 of its employees and agents with intentional infliction of emotional distress, invasion of privacy, interference with appellant's marriage, and conspiracy. Those torts, appellant averred, arose from the following circumstances: (1) appellant was employed as the business agent of Local 24, Industrial Union of Marine and Shipbuilding Workers of America (Local 24); (2) in 1967, he had been convicted and sentenced in the Criminal Court of Baltimore for certain unspecified criminal charges; (3) in June, 1981, the defendants sent certain documents relating to his conviction (the indictment, docket entries, and a "mug" shot) to about 50 union members; (4) the defendants placed appellant under surveillance; and (5) on three occasions, in August and October, 1981, and in January, 1982, the defendants sent certain reports concerning his marital infidelity to his wife, which ultimately led to a divorce.

By various rulings, the court effectively dismissed against all defendants the counts alleging invasion of privacy, interference with appellant's marriage, and conspiracy

to commit those torts. It concluded that (1) as appellant's criminal conviction was a matter of public record, publication of documents relating to it would not constitute a tortious invasion of his privacy, and (2) the alleged interference with his marital relationship was essentially a claim for alienation of affection, which is no longer a tort in Maryland. In addition to those rulings, the court entered summary judgment in favor of 23 of the individual defendants on the remaining counts, concluding as a matter of law from the pleadings, deposition, affidavits, and other papers before it that those defendants had not participated in any conduct that would amount to an intentional infliction of emotional distress on appellant or in a conspiracy to engage in such conduct.

Appellant responded in June, 1984, with a second amended declaration that named three of the original defendants —Bethlehem, Harry O'Berry, and Milton Leubecker—and seven new ones: Interstate Bureau of Investigation (Interstate) and its director, Upton A. Skipper; Jerald A. Oppel, an attorney, and his professional association; and MP Industries, Inc. (MP) and two of its officials, James Hamilos and James Markakis.

Count One realleged the counts of the earlier declarations charging intentional infliction of emotional distress and conspiracy to commit that tort. Those alleged torts, as noted, were based on averments that the defendants had sent documents pertaining to appellant's criminal conviction to certain union officials, that they had placed appellant under surveillance, and that they had sent reports of appellant's extramarital affair to his wife. The remaining Counts—Two through Five—attempted again to charge invasion of privacy, intentional infliction of emotional distress, and conspiracy, with a somewhat embellished factual basis.

The factual underpinning of the new charges was set forth in Count Two. In a nutshell, appellant averred that the circulation to union officials of documents pertaining to

his criminal conviction, the surveillance, and the publication to his wife of information concerning his extramarital affair were all in retaliation for his efforts to prevent Bethlehem from contracting out to MP certain work that appellant believed was covered by a collective bargaining agreement between Bethlehem and Local 24. Specifically, he averred that (1) MP conspired with Bethlehem to violate a collective bargaining agreement between Bethlehem and Local 24 by contracting to do work covered by the collective bargaining agreement, (2) as business agent, appellant successfully grieved and recovered a substantial settlement from Bethlehem, (3) "[a]s a result of the aforegoing," the defendants conspired to cause Interstate and its director, Skipper, to place appellant under surveillance "in all his comings and goings including his function as an authorized Business Agent of the said Local Union, in grievance and contract negotiation and attendance at arbitration and other Union proceedings" and obtained written reports that contained specific statements and accusations of marital infidelity, and (4) the defendants turned those reports over to Bethlehem or its agents "pursuant to a plan between the said Defendants and Bethlehem ... to send the reports anonymously to the Plaintiff's wife." [1] Nothing was said in Counts Two through Five about the circulation of the criminal conviction documents or, indeed, whether the reports of appellant's marital infidelity were, in fact, sent to his wife.

In January, 1985, the court put an end to the proceeding by (1) dismissing the case entirely as to Bethlehem and its two employees (O'Berry and Leubecker) for lack of subject matter jurisdiction, and (2) dismissing Counts Two through Five as to all other defendants for lack of subject matter jurisdiction and granting summary judgment in their favor on Count One. The lack of subject matter jurisdiction arose

---

1. From evidence elicited through discovery, it appears that what Mrs. Pemberton actually received were "cut and paste" excerpts from reports made by Interstate to Bethlehem.

from the court's conclusion that the conduct attributed to the defendants would, at least arguably, constitute a violation of either § 7 or § 8 of the National Labor Relations Act (NLRA, 29 U.S.C. §§ 157, 158), and thus fall within the preemptive and exclusive jurisdiction of the National Labor Relations Board (NLRB). The summary judgments entered on Count One reflected the court's continuing belief that the conduct alleged therein was either not actionable or that there was insufficient admissible evidence to show that the defendants had engaged in the alleged conduct. This appeal followed, in which appellant challenges those rulings and certain ancillary rulings on discovery matters.

### I. *Subject Matter Jurisdiction*

As we have observed, all of the tortious conduct charged by appellant arose from three alleged activities: placing appellant under surveillance, circulating documents pertaining to his criminal conviction to members of Local 24, and sending reports of his marital infidelity to his wife. In his deposition testimony taken in connection with the earlier declarations, appellant affirmatively and repeatedly asserted that all of that activity was undertaken in retaliation for his successful challenging of the MP contract and to hinder him in the performance of his duties as a union business agent. The mailings to the union members came at a time when appellant was in a contested campaign for reelection as business agent and were regarded by him as an attempt to influence the election. His counsel also urged that retaliation was the sole motivation behind the defendants' alleged conduct. Arguing in opposition to their respective motions, he told the court:

> "Your Honor remembers from his civil rights experience and his labor experience there is one thing that an employer cannot do, and that is intrude in any way into the collective bargaining and legitimate representation by a labor organization of its employees. And in this case is filled with it. Robert Pemberton, action taken by Bethlehem Steel Company against Pemberton are specific violations of the [Wagner] Act, Taft-Hartley Act, and Labor

Management Relations Action of 1947, which prohibits an employer from interfering with, restraining, coercing employees.

Now, in the exercise of their rights to collectively—or to collectively bargain, what they did was destroy a militant unit official, or attempted to do it, all of it. And I don't want to get—I'm not going to get into the mailing question, but later all of this was for the purpose of interfering with the employee's rights to organize and be represented by the members of their own choosing, free from the interference of the employer.

This was some violation of a large federal public policy. Its effect was to destroy his home life, the purpose to destroy his home life, and the purpose to interfere with a union election, which of course was the mailing of the mug shots."

Section 7 of the NLRA (29 U.S.C. § 157) guarantees to employees the right to form, join, or assist labor organizations and to bargain collectively through representatives of their own choosing. Section 8 of the Act (29 U.S.C. § 158) makes it an unfair labor practice for an employer to interfere with employees in the exercise of their rights under § 7 or to dominate or interfere with the administration of a labor organization. There can be little doubt, and appellant does not seriously dispute, that the conduct charged to Bethlehem through the alleged acts of its agents could arguably constitute one or more unfair labor practices under § 8. Retaliation or even threats of retaliation for filing a grievance or otherwise engaging in protected activity constitutes a violation of § 8 (*Ad Art, Inc. v. NLRB,* 645 F.2d 669 (9th Cir.1981); *N.L.R.B. v. Lucy Ellen Candy Div. of F & F Lab., Inc.,* 517 F.2d 551 (7th Cir.1975)), as does the placing of employees and union officials under surveillance (*N.L.R.B. v. Chem Fab Corp.,* 691 F.2d 1252 (8th Cir.1982); *N.L.R.B. v. Berger Transfer & Storage Co.,* 678 F.2d 679 (7th Cir.1982)), and any attempt to interfere in the internal affairs and administration

of a union (*Kent Corp.*, 212 NLRB No. 88, 87 LRRM 1730 (1974)).

NLRA was enacted pursuant to the plenary and exclusive power of Congress to regulate interstate commerce. To the extent that the broad grant of authority under the Act to the National Labor Relations Board collided with or overlapped State law and procedure, questions of Federal supremacy and preemption necessarily arose. In some areas, Congress made clear certain exceptions to the Board's jurisdiction. *See Vaca v. Sipes*, 386 U.S. 171, 179–80, 87 S.Ct. 903, 910–11, 17 L.Ed.2d 842 (1967). But in other important areas—and particularly on the question of when, and under what circumstances, the States were free to exercise a concurrent jurisdiction over conduct that fell within the purview of § 7 or § 8 of the Act—Congress gave no clear guidelines.

In *San Diego Unions v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Supreme Court acknowledged the need to carry out the Congressional purpose "by giving application to congressional incompletion." *Id.*, 240, 79 S.Ct., 776. Reviewing earlier decisions of the Court, Justice Frankfurter wrote that the concern "has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted." Thus, he said, "[w]hen the exercise of state power over a particular area of activity threatened interference with the clearly indicated policy of industrial relations, it has been judicially necessary to preclude the States from acting." *Id.*, 243, 79 S.Ct., 778. Though acknowledging that preemption had not been applied where "the activity regulated was a merely peripheral concern of [the Act]" or where it "touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act," the Court declared that, "[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an

unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield." *Id.*, 243–44, 79 S.Ct., 778–79.

Recognizing that it is not always clear "whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections," the Court adopted the view that "[w]hen an activity is *arguably subject to* § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.*, 244–45, 79 S.Ct., 779 (emphasis added).

Articulation of this "arguably subject to" standard was intended to establish a definitive bright-line rule that could be easily applied by the lower courts in judging when and under what circumstances State laws could be enforced in this area, to substitute for the alternative approaches taken by the Court in earlier cases that had proved to be unsatisfactory. *See Motor Coach Employees v. Lockridge*, 403 U.S. 274, 290–91, 91 S.Ct. 1909, 1919–20, 29 L.Ed.2d 473 (1971). But that intention has never been entirely fulfilled. Indeed, the Supreme Court itself has declined to apply it in any sort of rigid fashion, prompting one noted commentator to observe that it "no longer seems to be the all-purpose, uniform rule of easy and consistent applicability which was envisioned at its articulation." 2 T. Kheel, *Labor Law* § 9.03[1] (1984).

We can see this almost from the beginning. Although the *Garmon* Court mentioned that conduct of merely peripheral concern to the Act or that was deeply rooted in local feeling had not previously been regarded as preempted, it gave no indication as to whether, under its new "arguably subject to" rule, such conduct would continue to be subject to State jurisdiction. In subsequent cases, however, the Court made clear that that kind of conduct remained "exempt" from preemption. *See Motor Coach Employees v. Lockridge, supra,* 403 U.S. at 297, 91 S.Ct. at

1923; *Farmer v. Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977); *Sears, Roebuck & Co. v. Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978); *see also Vane v. Nocella,* 303 Md. 362, 372, 494 A.2d 181 (1985), where the Court of Appeals referred to the " 'peripheral concern' exception" and the " 'deeply rooted in local feeling' exception" to the *Garmon* preemption rule.[2] In *Operating Engineers v. Jones,* 460 U.S. 669, 676, 103 S.Ct. 1453, 1458, 75 L.Ed.2d 368 (1983), the Court explained:

> "Our approach to the pre-emption issue has thus been stated and restated. First, we determine whether the conduct that the State seeks to regulate or to make the basis of liability is actually or arguably protected or prohibited by the NLRA. *Garmon, supra,* [359 U.S.] at 245 [79 S.Ct. at 779]; see *Sears, supra* [436 U.S.] at 187–190 [98 S.Ct. at 1752–1754]. Although the *'Garmon* guidelines [are not to be applied] in a literal, mechanical fashion,' *Sears, supra* [436 U.S.] at 188 [98 S.Ct. at 1752], if the conduct at issue is arguably prohibited or protected otherwise applicable state law and procedures are ordinarily pre-empted. *Farmer, supra,* at 296. When, however, the conduct at issue is only a peripheral concern of the Act or touches on interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, it could not be inferred that Congress intended to deprive the State of the power to act, we refuse to invalidate state regulation or sanction of the conduct. *Garmon, supra* [359 U.S.] at 243–244 [79 S.Ct. at 778–779]. The question of whether regulation should be allowed because of the deeply rooted nature of the local interest involves a sensitive balancing of any

---

**2.** In *Lockridge,* 403 U.S. at 297, 91 S.Ct. at 1923, the Court seemed to add a third category of exemption—where "the particular rule of law sought to be invoked before another tribunal is so structured and administered that, in virtually all instances, it is safe to presume that judicial supervision will not disserve the interests promoted by the federal labor statutes." Whether this is really an independent exemption or merely a rationale for the other two is not altogether clear.

harm to the regulatory scheme established by Congress, either in terms of negating the Board's exclusive jurisdiction or in terms of conflicting substantive rules, and the importance of the asserted cause of action to the State as a protection to its citizens. See *Sears, supra* [436 U.S.] at 188–189 [98 S.Ct. at 1752–1753]; *Farmer, supra* [430 U.S.] at 297 [97 S.Ct. at 1061]."

Although these "exemptions" have been considered in a variety of contexts, they have a particular significance in cases like the one now before us—tort claims based on State law that arise from conduct arguably prohibited under NLRA, § 8.[3] What the Supreme Court seems actually to have done in such cases, despite the sometimes varying language used to explain or justify it, is to look at the complaint and the nature of the relief sought under State law, determine the extent of the NLRB's statutory interest in the type of conduct underlying the complaint, and, to the extent of any lack of NLRB interest in that type of conduct, examine the legitimate interest of the State in regulating that conduct.

An early example of that kind of analysis was *Linn v. Plant Guard Workers*, 383 U.S. 53, 55, 86 S.Ct. 657, 659, 15 L.Ed.2d 582 (1966), where the Court concluded that "where either party to a labor dispute circulates false and defamatory statements during a union organizing campaign, [a] court does have jurisdiction to apply state remedies if the complainant pleads and proves that the statements were made with malice and injured him." Speaking for the Court, Justice Clark observed that:

"The malicious publication of libelous statements does not in and of itself constitute an unfair labor practice. While the Board might find that an employer or union violated

---

**3.** Appellees' preemption argument is based essentially on the notion that the conduct charged to them is arguably prohibited under § 8 in that it would deny or interfere with appellant's rights under § 7. There seems to be no reasonable basis for an argument that the conduct charged to appellees is arguably protected by NLRA.

§ 8 by deliberately making false statements, or that the issuance of malicious statements during an organizing campaign had such a profound effect on the election as to require that it be set aside, it looks only to the coercive or misleading nature of the statements rather than their defamatory quality. The injury that the statement might cause to an individual's reputation—whether he be an employer or union official—has no relevance to the Board's function.... The Board can award no damages, impose no penalty, or give any other relief to the defamed individual."

*Id.*, 63, 86 S.Ct., 663 (citation omitted).

In contrast, the Court continued, State remedies *are* designed to afford relief to the defamed individual. Thus: "[t]he Board's lack of concern with the 'personal' injury caused by malicious libel, together with its inability to provide redress to the maligned party, vitiates the ordinary arguments for preemption." *Id.*, 64, 86 S.Ct., 664.[4]

The Supreme Court reached a similar conclusion 11 years later in connection with another intentional tort—one of those at issue here, intentional infliction of emotional distress. In *Farmer v. Carpenters, supra,* 430 U.S. 290, 97 S.Ct. 1056, the Court considered a State court action filed by an employee against his union. In a four-count complaint, the employee alleged that as a result of his dissidence as to certain union policies, "he was subjected to a campaign of personal abuse and harassment in addition to continued discrimination in referrals from the hiring hall." *Id.*, 292, 97 S.Ct. 1059. Count Two alleged that the union engaged in "outrageous conduct, threats, and intimidation" which caused the complainant grievous emotional distress resulting in bodily injury. *Id.*, 293, 97 S.Ct., 1059.

———

4. In a footnote to that statement, the Court noted that the lack of authority by the NLRB "to grant effective relief aggravates the State's concern since the refusal to redress an otherwise actionable wrong creates disrespect for the law and encourages the victim to take matters into his own hands." *Id.,* n. 6.

The trial court rejected the union's preemption argument and allowed the case to go to a jury. It refused, however, an instruction that the jury could not consider evidence regarding discrimination with respect to employment opportunities or hiring procedures. The State appellate court reversed the money judgment entered in favor of the employee on the ground of preemption.

The Supreme Court acknowledged that, in the context of the employee's other allegations of discrimination in hiring hall referrals, his allegations in Count Two of tortious conduct "might form the basis for unfair labor practice charges before the [NLRB]" and that "[o]n this basis a rigid application of the *Garmon* doctrine might support the conclusion of the California courts that [the employee's] entire action was preempted by federal law." *Id.*, 302, 97 S.Ct., 1064. But, it continued, that doctrine has not been inflexibly applied. With respect to the claims of intentional infliction of emotional distress, "we cannot conclude that Congress intended exclusive jurisdiction to lie in the Board." *Id.*

Citing *Linn, supra,* 383 U.S. 53, 86 S.Ct. 657, and applying essentially the same analysis, the Court held that no provision of NLRA protected the kind of "outrageous conduct" complained of in the second count, and that "[r]egardless of whether the operation of the hiring hall was lawful or unlawful under federal statutes, there is no federal protection for conduct on the part of union officers which is so outrageous that 'no reasonable man in a civilized society should be expected to endure it.'" *Id.* On the other hand, said the Court, the State does have a substantial interest in protecting its citizens from that kind of abuse. That interest, the Court concluded, "is no less worthy of recognition" than the State's interest in protecting against physical injury or damage to reputation, exempted from the preemption doctrine, respectively, in *Automobile Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958), and *Linn.*

As in *Linn*, the Court declined to apply the preemption doctrine generally, but instead surgically excised from the scope of permitted State jurisdiction only that conduct presenting "a realistic threat of interference with the federal regulatory scheme." 430 U.S. at 305, 97 S.Ct. at 1066. In *Farmer*, that had to do with the charge of discrimination in the hiring hall. That kind of activity *was* within the exclusive purview of the NLRB and could not be dealt with under State law. Because of the trial court's refusal to withdraw that element from the jury's consideration and the "consequent risk that the jury verdict represented damages for employment discrimination rather than for instances of intentional infliction of emotional distress," the Court could not simply reinstate the trial court judgment but, in effect, remanded the case for new trial. *Id.*, 306, 97 S.Ct., 1066.

The preemption doctrine was reviewed again a year later in *Sears, Roebuck & Co. v. Carpenters, supra*, 436 U.S. 180, 98 S.Ct. 1745, the issue there being whether a State was precluded from enforcing its trespass law by enjoining picketing on company property; the precise relief sought was to remove the pickets from company property to adjoining public walkways. The California appellate court vacated an injunction to that effect, concluding that because the picketing was both arguably protected under NLRA, § 7 and arguably prohibited under § 8 of that Act, State jurisdiction was preempted. *Id.*, 182–84, 98 S.Ct. 1749.

Reviewing again some of its earlier decisions, the Supreme Court observed that different considerations had been applied in deciding whether State action was preempted, depending on whether the conduct in question was arguably protected or arguably prohibited under NLRA. *Id.*, 190, 98 S.Ct., 1754. Although in both instances, the paramount factor is the NLRB's "primary jurisdiction," that jurisdiction is more significant in terms of protected activity because of the greater implication of Federal supremacy. *Id.*, 200, 98 S.Ct., 1759.

Where the conduct at issue is arguably *prohibited,* the Court said that it has looked to whether there is a significant State interest in protecting the complainant from the conduct and, notwithstanding that the conduct "occurred in the course of a labor dispute and an unfair labor practice charge could have been filed," *Id.,* 196, 98 S.Ct., 1757, whether the exercise of State jurisdiction entails a risk of interference with the regulatory jurisdiction of the NLRB. In that context, the Court held, at 197, 98 S.Ct. at 1757:

"The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application *but whether the controversy presented to the state court is identical to* (as in *Garner* [*v. Teamsters Union,* 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953)]) *or different from* (as in *Farmer*) *that which could have been, but was not, presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board* which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid."

(Emphasis added.)

Using that standard, the Court decided that preemption was inappropriate in the case before it. The NLRB would be concerned only with the motivation for the picketing, not its location, and therefore would not have to determine whether there had been a trespass. The State court, however, was concerned only with the question of trespass—the location of the picketing. *Id.,* 198, 98 S.Ct., 1758.

Where, on the other hand, the conduct is arguably *protected,* concurrent jurisdiction becomes more of a problem. *Id.,* 209–10, 98 S.Ct., 1763–64. In the particular case, the Court noted, there indeed existed a "potential overlap between the controversy presented to the state court and that which the Union might have brought before the NLRB," concerning "an accommodation of Sears' property rights and the Union's § 7 rights." 436 U.S. at 200–01, 98 S.Ct. at

1759. But, the Court continued, "[t]he primary-jurisdiction rationale justifies preemption only in situations in which an aggrieved party has a reasonable opportunity either to invoke the Board's jurisdiction himself or else to induce his adversary to do so." *Id.*, 201, 98 S.Ct., 1759. In that case, the Court said, Sears was unable to do either and therefore was not precluded from resorting to State court. *Id.*, 201–02, 98 S.Ct. 1759–60.

The Supreme Court has revisited the preemption area a number of times since *Sears*, but, in terms of what is before us here, it has offered up nothing new. In *Operating Engineers v. Jones*, 460 U.S. 669, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983), the Court reaffirmed its earlier decision in *Iron Workers v. Perko*, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963), that an action by a company employee against a union for procuring his discharge, and thus tortiously interfering with his employment contract, was preempted. In contrast to the situation in *Sears*, the Court held that Jones's complaint was fully within the jurisdiction of the NLRB and could have been presented to that Board. *See also Vane v. Nocella, supra,* 303 Md. 362, 494 A.2d 181.

In *Belknap, Inc. v. Hale,* 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983), the Court refused to preempt a State court action for breach of contract and misrepresentation filed against an employer by some of its former employees. The complainants alleged that they had been hired to replace striking workers and had been promised "permanent" employment, but that they were discharged when the strike ended to make room for the reinstated strikers. The Court acknowledged that the issue of whether the employer was obliged to reinstate the striking workers and whether its promise of permanent employment to the replacement workers was forbidden were squarely within the jurisdiction of the NLRB, but, in light of *Linn* and *Farmer,* concluded

that that did not require preemption.[5] The Board's focus, it said, would be on the rights of the striking workers, not on whether Belknap deceived the replacements. Thus, while the State had a substantial interest in protecting its citizens from misrepresentation, the State action would be of no more than peripheral concern to the Board. *Id.*, 510–11, 103 S.Ct. 3183.

■ Because the conduct forming the basis of appellant's complaint is not arguably protected under NLRA, § 7, but is arguably prohibited under § 8, we apply the standard for arguably prohibited conduct set forth in *Sears,* namely, whether the controversy presented to the Circuit Court "is identical to ... that which could have been, but was not, presented to the Labor Board." *Id.*, 197, 98 S.Ct., 1757. *See United Credit Bur. of America, Inc. v. N.L.R.B.*, 643 F.2d 1017, 1025 (4th Cir.), *cert. denied* 454 U.S. 994, 102 S.Ct. 539, 70 L.Ed.2d 404 (1981). In applying that standard, however, we look not just at whether the conduct at issue would constitute an unfair labor practice. As noted, the conduct at issue in *Linn, Farmer,* and *Belknap* would arguably have constituted one or more unfair labor practices. Rather, we look to the second amended declaration to see if there is something of substance pled there that extends beyond an arguable unfair labor practice—something in or arising from the conduct that would be of merely "peripheral concern" to the NLRB but of significant interest to the State.

We think there is.

---

**5.** The Court's interpretation of its holdings in *Linn* and *Farmer* is of interest. 463 U.S. at 509, 103 S.Ct. at 3182, it regarded *Linn* as holding that "false and malicious statements in the course of a labor dispute were actionable under state law if injurious to reputation, *even though such statements were in themselves unfair labor practices adjudicable by the Board.*" (Emphasis added.) It considered *Farmer* as holding that NLRA "did not preempt a state action for intentionally inflicting emotional distress, *even though a major part of the cause of action consisted of conduct that was arguably an unfair labor practice.*" (Emphasis added.)

■ The NLRB might well take an interest in Bethlehem's alleged attempt to dominate Local 24's internal activities, or to undermine appellant's effectiveness as a union representative, or to retaliate against him, either as an employee or as a union representative, for vigorous enforcement of a collective bargaining agreement. All of that is within the competence and primary jurisdiction of the Board. But, as in *Linn, Farmer,* and *Belknap,* we do not see that the Board would have any statutory concern as to whether, as an ancillary matter, that conduct, designed to achieve those results, was sufficiently egregious and damaging to appellant personally to constitute the torts of intentional infliction of emotional distress or invasion of privacy. The same evidence that might justify the NLRB in finding an unfair labor practice might not suffice to establish either one or both of those torts. In that sense, appellant's claim in this proceeding is a function of the *manner* in which the conduct was exercised rather than a function of the conduct itself, and that is not preempted. *See Farmer;* also *Garibaldi v. Lucky Food Stores, Inc.,* 726 F.2d 1367 (9th Cir.1984), *cert. denied* —— U.S. ——, 105 S.Ct. 2319, 85 L.Ed.2d 839 (1985); *Gulati v. Burlington Northern R. Co.,* 364 N.W.2d 446 (Minn.App.1985) (action under State law for abusive discharge not preempted); and *Silkwood v. Kerr-McGee Corp.,* 637 F.2d 743 (10th Cir. 1980), *cert. denied* 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981); but *compare Bell v. Union Carbide Corp.,* 582 F.Supp. 824 (E.D.Tenn.1984); *Intern. Broth. of Elec. Workers v. Morton,* 428 So.2d 15 (Ala.1985); and *Collins v. MBPXL Corp.,* 9 Kan.App.2d 363, 679 P.2d 746 (1984).

Appellant has pled, and through some evidence has attempted to show, that the defendants' conduct was sufficiently egregious to constitute the torts of intentional infliction of emotional distress, invasion of privacy, and conspiracy. That *type* of conduct amounts to more than a mere unfair labor practice. To the extent that it does, State action to redress it is not preempted. We therefore conclude that the trial court erred in dismissing Counts Two

through Five against all defendants for want of subject matter jurisdiction.[6]

## II. *Other Dispositions*

Having concluded that the Circuit Court had jurisdiction to consider appellant's complaints, we now look to see if there is sufficient substance to them to warrant further proceedings. In so doing, we have to give regard to the different statuses of the various defendants.

### A. *Bethlehem's Non-Managerial Employees*

■ On June 19, 1984, the court granted summary judgment in favor of 23 Bethlehem employees who had been joined as defendants in the amended declaration. Those employees were either in non-managerial or relatively low managerial positions but were nevertheless charged with complicity in the various schemes set forth in the pleading. Each filed an affidavit affirming that he "was not involved in, did not help with, did not participate in, authorize, or have personal knowledge of" or conspire to bring about any of the incidents alleged by appellant. Appellant offered no admissible evidence to contradict those sworn assertions, and thus they stood (and stand) undisputed.

Appellant's sole contention on appeal with respect to those employees is that he was precluded from obtaining information through discovery that *might* have given him a basis for challenging those affidavits. There are two answers to that contention. First, it makes apparent that appellant had no basis in the first instance to sue those individuals; his joining them in the absence of *any* admissible evidence indicating their complicity proved to be merely a hopeful but non-availing fishing expedition. Second, the court found as a fact that the defendants had fully complied with the discovery order and, from the record before us, we

---

**6.** In light of this conclusion, it is unnecessary for us to consider whether the preemption doctrine would, in any event, preclude an action against anyone other than Bethlehem and perhaps its supervisory employees.

do not believe that it erred in so finding. Counsel for Bethlehem represented to the court that he had turned over all of the documents sought that Bethlehem had, and the court had a right to accept that statement. We therefore find no error in the entry of those summary judgments.

### B. *Oppel,[7] MP, Hamilos, Markakis, Interstate, and Skipper*

#### (1) *Procedural Status*

These defendants were brought into the case through the second amended declaration.

Oppel, MP, and Skipper filed motions to dismiss Counts Two through Five for failure to state a cause of action; they also moved for summary judgment on all counts, contending in supporting affidavits that they had not engaged in any of the tortious conduct alleged. Interstate also moved for summary judgment on all counts, but apparently did not file a motion to dismiss for failure to state a cause of action. Hamilos and Markakis filed no motions of any kind.

None of these defendants raised the issue of subject matter jurisdiction (preemption); it was solely on that ground, however, that the court ultimately dismissed Counts Two through Five as to them. They prevailed on Count One by way of summary judgment.

▮ The defenses raised in the motions to dismiss—whether the facts alleged by appellant suffice to constitute the torts of intentional infliction of emotional distress, invasion of privacy, or conspiracy to commit those torts—are also, of course, cognizable through a motion for summary judgment. If the pleadings, deposition, and other evidentiary items in the record establish a failure to state a claim upon which relief can be granted, the defendants would be entitled to judgment as a matter of law. We think that, by

---

7. For convenience, we shall use the name Oppel as including both Mr. Oppel individually and his professional association.

filing the subsequent motions for summary judgment and thus by asking the court to look beyond the mere averments in the second amended declaration and to consider as well appellant's deposition and the various affidavits and other documents, Oppel, MP, and Skipper effectively elected to proceed on the motions for summary judgment in place of their motions to dismiss. *Gilbert v. Washington Suburban Sanitary Commission,* 304 Md. 658, 500 A.2d 1039 (1985).[8] As to Hamilos and Markakis, if otherwise appropriate, summary judgment can be entered even without a motion seeking such relief. *Litton Bionetics v. Glen Constr.,* 292 Md. 34, 42, 437 A.2d 208 (1981).

As noted, the court actually ruled on the motions for summary judgment as to Count One, charging intentional infliction of emotional distress. The basis for that ruling, however, necessarily applies as well to Counts Four and Five, which also charged intentional infliction of emotional distress or conspiracy to commit that tort. As we have seen, except for the expanded averments as to motivation, those counts rested on essentially the same conduct as Count One.

The court never ruled on the issue of invasion of privacy as set forth in Counts Two and Three of the second amended declaration. It had, however, ruled on precisely that issue as raised in the earlier declarations, once when it sustained demurrers to the original declaration and again when it entered summary judgment in favor of the 23

---

**8.** We need not consider here whether the filing of a motion for summary judgment raising essentially the same defense raised in an earlier motion to dismiss necessarily acts as a withdrawal of the motion to dismiss, although, as a practical matter it would, in most cases, make little sense to ignore the summary judgment motion. Where possible, the court should act upon the greatest amount of information properly before it. Moreover, if it were to grant the motion to dismiss based solely on a deficiency in the pleading where sufficient evidence has been produced through discovery to require denial of the motion for summary judgment, the court would likely be obliged to allow the plaintiff to amend his pleading, and so little would be accomplished.

Bethlehem employees. The court announced its conclusion that appellant's right to privacy had not been tortiously invaded by any of the three activities about which he complained.

It is apparent, therefore, that the sufficiency of appellant's averments and evidence with respect to intentional infliction of emotional distress and invasion of privacy were both presented to and ruled upon by the trial court, and it is therefore properly before us.

### (2) *Intentional Infliction of Emotional Distress*

■ To establish the tort of intentional infliction of emotional distress, appellant was obliged to show (1) that the conduct complained of was intentional or reckless, (2) that it was also extreme and outrageous, (3) that it caused emotional distress, and (4) that the emotional distress was severe. *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977). All four elements must be shown. *Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 58, 502 A.2d 1052, 1063 (1986). Assuming, *arguendo*, that appellant produced sufficient evidence (to withstand summary judgment) of elements (1) and (3), he clearly failed to produce such evidence as to elements (2) and (4).

■ For conduct to meet the test of "outrageousness," it must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Restatement of Torts 2d*, § 46, quoted in *Harris, supra*, 281 Md. at 567, 380 A.2d 611. Whether the conduct complained of meets that test is, in the first instance, for the court to determine, and, in addressing that question, the court must consider not only the conduct itself but also the "personality of the individual to whom the misconduct is directed." *Harris, supra*, at 568–69, 380 A.2d 611. We do not regard the sending of truthful information pertaining to the criminal conviction of an admittedly rough-and-tumble labor official to his fellow union members, the placing of such a

person under the kind of surveillance indicated in this record, or the sending of truthful information about his extramarital affair to his wife to meet the test laid down in *Harris*. *See Vance v. Vance*, 286 Md. 490, 505–06, 408 A.2d 728 (1979); *Continental Cas. Co. v. Mirabile*, 52 Md.App. 387, 404–05, 449 A.2d 1176, *cert. denied* 294 Md. 652 (1982); *Hamilton v. Ford Motor Credit Co., supra*, 66 Md.App. at 59–60, 502 A.2d at 1063–1064.

■■■ Nor has appellant pled or shown the degree of distress required. To satisfy the fourth requirement, a plaintiff must establish a truly devastating effect from the defendant's conduct. The emotional response must be so acute "that no reasonable person could be expected to endure it"; he must be "unable to function," "unable to attend to necessary matters." *Hamilton, supra*, at 60, 502 A.2d at 1064. There is no such indication here.

For these reasons, we conclude that these defendants were entitled to summary judgment on Counts One, Four, and Five.

### (3) *Invasion of Privacy*

The Court of Appeals held in *Carr v. Watkins*, 227 Md. 578, 177 A.2d 841 (1962), that, in a proper case, Maryland would recognize an action for unwarranted invasion of privacy. In subsequent cases—most recently *Lawrence v. A.S. Abell Co.*, 299 Md. 697, 475 A.2d 448 (1984), and *Hollander v. Lubow*, 277 Md. 47, 351 A.2d 421, *cert. denied* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976)—the Court has looked primarily to *Restatement of Torts 2d*, §§ 652A–652E, and to W. Prosser, *The Law of Torts* (3d and 4th eds.), in defining the kind of conduct that it would regard as actionable. Four categories of such conduct have been recognized, of which only two are relevant here—intrusion upon seclusion and publicity given to one's private life. Appellant claimed that the surveillance undertaken of his activities amounted to an improper intrusion on his seclusion and that the mailing of his "mug" shot and

excerpts from the detective reports constituted unwarranted publicity of his private life.

Of the three activities complained of, only one—surveillance—was admitted. Oppel and Interstate acknowledged that Bethlehem had engaged Interstate to surveil appellant, claiming that the purpose of the surveillance was to determine whether he or his union was responsible for the sabotage of certain equipment at Bethlehem's Key Highway Shipyard. All of the defendants disclaimed any knowledge of or participation in the other two activities. More significantly, appellant was unable to offer any admissible evidence that any of these defendants either knew about or had anything to do with the circulation of his criminal history record or the mailing of the detective reports to his wife.

In his deposition testimony, appellant conceded that he had no facts to show that anyone had purloined his "mug shot" from the police department and that he did not know who actually put together the criminal history documents or mailed them. Nor could he identify the person or persons who put together the excerpts from the various detective reports and mailed them to his wife. He was convinced that the mailings had come from Bethlehem's Key Highway yard because (1) one of the union members who received the conviction documents said that the envelope contained an incorrect address and that the only other mail so addressed to him had come from Bethlehem, (2) one Walter Comer, former Superintendent of Industrial Relations for Bethlehem, attested in an affidavit that, at Oppel's suggestion, Bethlehem had engaged Interstate to place appellant under surveillance, that certain Bethlehem officials had received copies of Interstate's reports, and that he had seen in the office of one of those officials, Joseph Krysiak, an envelope addressed to Mrs. Pemberton, and (3) Bethlehem had a motive to engage in this activity in order to discredit him.

None of this, of course, suffices to show complicity in the alleged circulation of documents to the union members or

Mrs. Pemberton on the part of these defendants. To the extent that appellant's invasion of privacy claim arises from those mailings, therefore, these defendants were entitled to judgment as a matter of law simply because appellant failed to produce evidence that they had engaged in the activity.

We are left then, as to these defendants, with the matter of the surveillance. Interstate and Skipper conducted the surveillance; according to the affidavit of Walter Comer, MP, Hamilos, and Oppel were involved in the decision to undertake the surveillance, which was made following a complaint from MP about appellant and the union. Comer indicated that an object of the investigation was to determine "whether [appellant] had girlfriends and where he got his money," which is a quite different purpose than that asserted by Oppel—one which can have only the most tangential relevance to any legitimate concern of Bethlehem or MP. Assuming this objective, as we must for purposes of summary judgment, we do not believe that Oppel, MP, and Hamilos can disassociate themselves from the manner in which the surveillance was conducted simply by claiming that Interstate was an independent contractor. Oppel in particular, according to Comer, remained involved in the implementation of the investigation and surveillance. These defendants, therefore, were not entitled to summary judgment by reason of non-participation; the question, then, is whether the surveillance amounted to an improper intrusion. As no similar evidence was presented as to Markakis, he *was* entitled to summary judgment.

*Restatement of Torts 2d,* § 652B describes this branch of the tort as the intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person. As pointed out in Comment c to § 652B, the gist of the offense is the intrusion into a private place or the invasion of a private seclusion that the plaintiff has thrown about his person or affairs. There is no liability for observing him in public places, "since he is not then in seclusion."

██ Surveillance, depending on how it is conducted, may constitute such an intrusion. *See, for example, Galella v. Onassis,* 353 F.Supp. 196 (S.D.N.Y.1972), *modified on other grounds,* 487 F.2d 986 (2d Cir.1973); *Nader v. General Motors Corporation,* 25 N.Y.2d 560, 307 N.Y.S.2d 647, 255 N.E.2d 765 (1970). If conducted in a reasonable and non-obtrusive manner, it is not actionable. *McLain v. Boise Cascade Corporation,* 271 Or. 549, 533 P.2d 343 (1975); *Forster v. Manchester,* 410 Pa. 192, 189 A.2d 147 (1963); *Ellenberg v. Pinkerton's, Inc.,* 130 Ga.App. 254, 202 S.E.2d 701 (1973).

██ There is some dispute in the record as to the exact nature of the surveillance at issue here. In his affidavit, Mr. Skipper stated that actual surveillance was conducted on 12 days—November 27–30, 1979; December 3, 6, 8, and 19, 1979; January 20, 21, 22, 1980; and February 18, 1980.[9] He averred that the surveillance consisted of observing appellant from outside his residence, outside what appeared to be his girlfriend's home, outside a shopping center and convenience store, and along public roads. Interstate's reports summarizing the surveillance on 9 of the 12 days are in the record, and they tend to confirm Mr. Skipper's assertions. That evidence, coupled with appellant's concession in his deposition testimony that he was unaware of the surveillance while it was being conducted, would justify judgment in favor of the defendants. That kind of surveillance does not, under the caselaw, constitute an actionable invasion of privacy.

██ The problem is that the excerpts received by Mrs. Pemberton show a more extensive intrusion. They reveal that, on at least one occasion, a "detection device" was placed on the door of a motel room where appellant was staying and that surveillance (either on that occasion or another) was maintained from the bottom of a stairwell.

---

**9.** The date December 19 may be in error. There is a report showing a surveillance on December 10 but no report for December 19.

The record is not entirely clear as to the nature of the "detection device," but from other statements in the excerpts, a fair inference can be drawn that it was a listening device of some sort. That kind of surveillance has been held actionable. *See Hamberger v. Eastman*, 106 N.H. 107, 206 A.2d 239 (1965); *McDaniel v. Atlantic Coca-Cola Bottling Co.*, 60 Ga.App. 92, 2 S.E.2d 810 (1939); *Roach v. Harper*, 143 W.Va. 869, 105 S.E.2d 564 (1958); also Annot., *Right of Privacy—Eavesdropping*, 11 A.L.R.3d 1296 (1967).

■ In considering a motion for summary judgment, the court is obliged to resolve all inferences against the moving party. *Berkey v. Delia*, 287 Md. 302, 413 A.2d 170 (1980). It is fairly inferrable from the record before us that a surveillance, not reflected in the nine Interstate reports, was undertaken at a motel and that a listening device was attached to the door in order that the detective could hear what transpired inside the room. Given those inferences, it appears that summary judgment would be inappropriate with respect to the complaint that the surveillance directed or undertaken by these defendants (other than Markakis) constituted an actionable intrusion upon appellant's seclusion or private affairs. That issue, therefore, arising under Counts Two and Three, must be returned to the Circuit Court.

### C. *Bethlehem, Leubecker, and O'Berry*

In addition to their motions based on lack of subject matter jurisdiction, these defendants moved to dismiss the second amended declaration for failure to state a claim upon which relief could be granted. For the reasons noted above in connection with the defendants Oppel, *et al.*, we shall view those motions as ones for summary judgment.

■ Unlike the situation with respect to Oppel, *et al.*, there was some evidence that Leubecker and O'Berry, and through them Bethlehem, participated in some way in all three activities complained of by appellant. This evidence derives in part from Mr. Comer's affidavit, appellant's testi-

mony regarding the incorrect address on one of the mailings, and the documents themselves.

For the reasons already stated in Part II B(2), we conclude that appellant has nevertheless failed to establish a case of intentional infliction of emotional distress, and so these defendants were also entitled to summary judgment on Counts One, Four, and Five. For the reasons stated in Part II B(3), we believe that they were not entitled to summary judgment on Counts Two and Three on the intrusion on seclusion issue. That leaves remaining the question of whether they have any liability under Counts Two and Three by reason of the circulation of appellant's conviction documents and the mailings to appellant's wife.

These activities fall within that branch of the tort making actionable the publicizing of matters concerning one's private life. *See Restatement, supra,* § 652D. To come within that branch of the tort, the matter disclosed must be a private fact and it must be made public. With respect to the latter requirement, Comment a to § 652D makes clear that "it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." *Accord Vogel v. W.T. Grant Company,* 458 Pa. 124, 327 A.2d 133 (1974); *Tureen v. Equifax, Inc.,* 571 F.2d 411 (8th Cir.1978); *Beard v. Akzona, Inc.,* 517 F.Supp. 128 (E.D.Tenn.1981); *Brown v. Mullarkey,* 632 S.W.2d 507 (Mo.Ct.App.1982); *compare Prosser and Keeton on the Law of Torts* § 117, at 857 (W.P. Keeton 5th ed. 1984). In light of that requirement, it is clear that there can be no liability with respect to the mailing of the excerpts from the detective reports to appellant's wife; that does not constitute a publicizing of the reports or the information contained therein.

Appellant's complaint about the circulation of his criminal records fails because of the former requirement; they are not private facts. The requirement that the information publicized be private in nature is both an element of

the tort itself and is necessitated by First Amendment principles. In *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Supreme Court noted that "even the prevailing law of invasion of privacy generally recognizes that the interests in privacy fade when the information involved already appears on the public record," but that, in addition, the First and Fourteenth amendments prohibit States from imposing sanctions "on the publication of truthful information contained in official court records open to public inspection." *Id.,* 494–95, 95 S.Ct., 1045–46.

Comment b to *Restatement 2d,* § 652D, expresses the view that "[t]here is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public. . . . On the other hand, if the record is one not open to public inspection, as in the case of income tax returns, it is not public, and there is an invasion of privacy when it is made so." In the fourth edition of his work (pp. 809–11), Prosser also appeared to adopt the "open to public inspection" standard, and we note that that passage of his work was quoted extensively in *Hollander v. Lubow, supra,* 277 Md. at 57–58, 351 A.2d 421.[10]

---

**10.** The fifth edition, edited principally by Professor Keeton, backtracks a bit. After quoting the passage from the fourth edition, Keeton states, at 859, that merely because a fact "can be found in a public record, does not mean that it should receive widespread publicity if it does not involve a matter of public concern." That statement is immediately followed, however, by the sentence, "There can be such a thing as highly offensive publicity to something that happened long ago even though it occurred in a public place."

Keeton's view may be presaging a change in the law, or it may be intended to apply only in a limited circumstance. The case cited for it—*Street v. National Broadcasting Co.,* 645 F.2d 1227 (6th Cir.) *cert. dismissed* 454 U.S. 1095, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981)—was an unusual one. The *Restatement* adheres to the view, expressed in Comment k to § 652D that generally "a lapse of time, even of considerable length, since the event that has made the plaintiff a public figure, does not of itself defeat the authority to give him publicity or to renew publicity when it has formerly been given." As to matters of public record, it states that "[a]lthough lapse of time may not impair the authority to give publicity to a public record, the pointing out of

We need go no further than *Cox Broadcasting Corp.* to hold that the circulation of court records pertaining to appellant's conviction is Constitutionally protected and cannot, therefore, form the basis of tort liability. Circulation of the "mug shot" presents a somewhat different question, but, unfortunately for appellant, the answer is the same.

Adoption of an "open to public inspection" standard—whether Constitutionally or as a matter of common law—necessarily brings into consideration the effect of "Freedom of Information" or "Public Information" laws, such as Md.Code Ann.State Gov't art., §§ 10–611—10–628. *See Ind. Foundation, Etc. v. Texas Ind. Acc. Bd.*, 540 S.W.2d 668 (Tex.1976), *cert. denied* 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977). Those acts, mostly of relatively recent origin, give public access to a wide variety of documents that formerly were shielded from public view.

Section 10–611(f) of the Maryland Act defines a "public record" as "any documentary material that ... is made by a unit or instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business ... and ... is in any form, including ... a photograph...." That, of course, includes police records and "mug shots." 57 Op.Att'y Gen. 518, 519 (1972); *compare Whittle v. Munshower*, 221 Md. 258, 155 A.2d 670 (1959), *cert. denied* 362 U.S. 981, 80 S.Ct. 1069, 4 L.Ed.2d 1016 (1960), decided before enactment of the State Public Information Act.

Section 10–613(a) states explicitly that "[e]xcept as otherwise provided by law, a custodian [of public records] shall permit a person ... to inspect any public record at any reasonable time." The only conditions or exceptions to that broad requirement are set forth in §§ 10–615—10–619. The first three of those sections are flat-out exceptions; they specify the kinds of public records to which public access

the present location and identity of the individual raises a quite different problem."

*must* be denied. "Mug shots" are not within any of those categories. Section 10–618(f) *permits* a custodian to deny inspection of "records of investigations conducted by . . . a police department" to the extent that inspection *"would . . .* constitute an unwarranted invasion of personal privacy . . . ."

 It is not at all clear that a "mug shot" necessarily constitutes or is part of a "record of investigation" so as to be permissibly excludable in the first instance. But assuming, *arguendo*, that it is of that character, the fact is that it is nevertheless a public record that is not *per se* excluded from public access. Many of these "mug shots" are retained for comparison purposes; victims of crime often are invited to look through books or arrays of them in order to identify their predators.

Under these circumstances and on this record, we cannot regard appellant's "mug shot" as being a private fact; it is, by law, a public record to which the public may have had access. Its circulation to the other union members would therefore not constitute a tortious invasion of privacy.

### III. *Summary Of Conclusions*

The summary judgments entered in favor of the 23 Bethlehem employees sued in the original or amended declaration are affirmed. Markakis is entitled to judgment on all counts. The other defendants (1) have no liability under Counts One, Four, and Five (intentional infliction of emotional distress) and are entitled to judgment on those counts, (2) have no liability under Counts Two and Three (invasion of privacy) by reason of the circulation of criminal history documents or the mailing of investigative reports to appellant's wife, but (3) are not entitled to summary judgment on Counts Two and Three because of a dispute of fact as to the nature of the surveillance conducted by Interstate and Skipper. The case will be remanded for the entry of judgments under Counts One, Four, and Five and for further proceedings under Counts Two and Three.

JUDGMENTS AFFIRMED IN PART, VACATED IN PART; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF JUDGMENTS AND FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID TWO-THIRDS BY APPELLANT, ONE-THIRD, EQUALLY, BY APPELLEES BETHLEHEM, MP, INTERSTATE, OPPEL, SKIPPER, HAMILOS, LEUBECKER, AND O'BERRY.